UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOLENE COX, | |
|     Plaintiff, | No. C 21-09850 WHA |
|     v. | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | **ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
|     Defendant. | |

## INTRODUCTION

In this social security appeal, claimant challenges the denial of her disability benefits. Because the administrative law judge improperly discounted medical opinion as to the severity of claimant's condition and based her findings on her own lay interpretation of treatment records, such findings are not supported by substantial evidence as required. Claimant's motion for summary judgment is **GRANTED** and this matter is **REMANDED** for further proceedings consistent with this order. Respondent's motion for summary judgment is **DENIED**.

## STATEMENT

In February 2017, claimant Jolene Cox applied for disability insurance benefits (AR 273–74). In her application, she alleged several mental impairments: "major depression," "mood swings," "hits herself," "fits of rage," and "emotionally unstable" (AR 83). The Social

Security Administration denied her application roughly two months later and denied it again upon reconsideration roughly two months after that (AR 95, 110). Claimant then requested a hearing before an administrative law judge ("ALJ"), which took place in February 2019 (AR 181–206). In April 2019, that ALJ denied her claim for benefits and determined that claimant was not disabled, at which point claimant first sought judicial review (AR 118–37). She filed suit in the Northern District of California in April 2020. *See Cox v. Saul*, No. C 20-02922 TSH.

In June 2020, another judge in this district approved the parties' stipulation to remand for further administrative proceedings, ordering that "[u]pon remand, the Appeals Council will instruct the Administrative Law Judge to reassess the evidence, develop the record as necessary, offer Plaintiff the opportunity for a new hearing and issue a new decision[.]" *Ibid*. (Dkt. No. 14). In August 2020, the Appeals Council remanded this matter to a second ALJ (AR 111–17). Note that it provided explicit instructions for this ALJ to:

- [O]btain additional evidence concerning the claimant's mental impairments, in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512). The additional evidence may include, if warranted and available, consultative examinations with psychological testing and medical source opinions about what the claimant can still do despite the impairments.

- Give further consideration to the treating and nontreating source opinions pursuant to the provisions of 20 CFR 404.1527 and nonexamining source opinions pursuant to the provisions of 20 CFR 404.1527, and explain the weight given to such opinion evidence. As appropriate, the ALJ may request the treating and nontreating sources provide additional evidence and/or further clarification of the opinions (20 CFR 404.1520b).

(AR 114–15).[1]

---

[1] The Appeals Council also provided instructions to the ALJ to "[g]ive further consideration to claimant's maximum residual functional capacity" and "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base" (AR 115). An impartial vocational expert testified at the subsequent hearing, and the ALJ adopted her opinions regarding claimant's inability to perform past work and prospective representative occupations (AR 23–24).

1    In March 2021, the ALJ held a hearing, at which claimant and vocational expert Kathleen
2    Macy-Powers testified (AR 38–81). At the hearing, claimant amended the onset date from
3    September 1, 2016, to October 31, 2016, and entered new evidence into the record (AR 42–43
4    (citing AR 348–49)). In June 2021, the ALJ determined that claimant was not disabled and
5    denied her disability benefits (AR 6–31). Even though the ALJ found that claimant suffered
6    from several severe impairments — Post Traumatic Stress Disorder ("PTSD"), major
7    depression, borderline personality disorder, and anxiety — she concluded that claimant
8    retained the residual functional capacity to perform a full range of work at all exertional levels
9    but with nonexertional limitations. These limitations were to "routine tasks that are equivalent
10   to unskilled work with a maximum specific vocational preparation (SVP) of 2," "no regular
11   interaction with the general public for the primary duties of the job," "up to occasional
12   interaction with coworkers and supervisors for primary duties of job," and "tasks [that] should
13   deal primarily with things rather than people" (AR 14–15). In light of these limitations, the
14   ALJ further concluded that claimant could not perform her past relevant work as a home health
15   aide and resident care aide, but that she could perform other jobs in the national economy, such
16   as "packager," "industrial cleaner," and "marker" (AR 23–24).

   After the ALJ issued her order, claimant once more requested judicial review and filed
   suit in this district in December 2021. The parties now cross-move for summary judgment.

   **1.    CLAIMANT'S TESTIMONY.**

   Claimant, born in 1961 and age fifty-five on the alleged disability onset date, met with
   several doctors for treatment and on the issue of her disability determination and testified in the
   February 2022 hearing before the ALJ.

   At that hearing, claimant explained that she had not worked regularly since 2016, when
   she took care of developmentally disabled individuals as a supported living counselor part-time
   (AR 47–48). According to claimant, she went on state disability for a year after two weeks of
   full-time work because her employer told her she had to work full-time or she would be fired
   (*ibid.*). Claimant further testified that she has not worked at all since 2018, when she
   irregularly filled in for sick workers who provided in-home support to her best friend (AR 46–

3

47, 52). She explained that she now receives in-home support services herself, twenty hours per month to help her with basic household chores, such as cleaning the living room and bathroom (AR 49–51). Since she was on state disability, claimant alleges to have gotten by financially on account of rental housing assistance, food stamps, and a nearby food bank (AR 49).

In addition, claimant testified that she leaves the house roughly three days a week, twice for tai chi and on occasion for errands (AR 50–51). She further testified that she goes to see Psychiatrist Martin Epson once a month and calls him when she is having urgent problems (AR 51). According to claimant's testimony, she has not had a therapist since the onset of the COVID-19 pandemic, as "[she] tried to get one after COVID, and it was just too hard for [her] to do over the phone" (*ibid.*). She also claimed to be on three medications (AR 52).

Under examination by her attorney, claimant described, *inter alia*, how she first went on state disability because she "was not sleeping anymore[,]" "would get up at night" and "turn the wrong way down one-way streets[,]" and would need "five days of down time to calm down" after "g[etting] really frustrated with a client" (AR 52–53). She discussed hitting herself with her hand and against the wall, as well as pacing triggered by either "preparing to do something that's frightening or that [she] believe[s] will not go well for [her] . . . [b]ut usually it's something interpersonal" (AR 53–54). She further discussed needing to shower multiple times per day to "help with all the mental tension and the agitation" (AR 54). According to claimant, she has recurrent feelings of people being mad at her, including physicians, which once led to her being escorted away by security at a Kaiser Permanente hospital (AR 56).

    **2.**    **MEDICAL OPINION EVIDENCE.**

Relevant here, the voluminous administrative record contains opinions from several health professionals regarding claimant's alleged mental impairments. They are briefly summarized below.

### A. MARTIN EPSON, M.D.

Dr. Martin Epson is a psychiatrist who began treating claimant in September 2018 and provided two medical source statements. The ALJ accorded both "little weight" (AR 18–20).

In the first medical source statement, dated January 2019 (AR 1157–60), Dr. Epson observed that claimant had marked to extreme limitations in dealing with supervisors, co-workers, and peers; ability to work in coordination with others; ability to complete a normal workday and week; ability to perform at acceptable production levels; and ability deal with work pressures (AR 1157–58). He further observed that claimant would need to be absent from work three or more times per month and opined that her assessed limitations started in March 2018, several months before he began treating claimant (AR 1159).

The ALJ explained that she gave little weight to this opinion because Dr. Epson had only treated claimant for four months at the time he completed this statement and therefore did not have a longitudinal treating relationship to find limits from the alleged onset date, and his findings were too restrictive when compared to claimant's treatment record and daily activities (AR 18–19). The ALJ emphasized that "the claimant was able to attend tai chi and writing classes, go shopping, have a birthday and work at SGA levels after the alleged onset date" (AR 18). She further emphasized that "[t]he treatment record in 2016 showed improved mood, and other normal exams, with good insight and judgment," and that claimant "was noted to have stable functioning and mood, with normal exams but for irritable mood" (AR 18–19) (internal citations omitted).

In his second medical source statement, dated March 2021 (AR 1509–16), Dr. Epson opined that it was reasonable to infer that claimant's impairments would cause her to be absent from work five times a month or more and that she would need to take unscheduled breaks (AR 1515). He further noted that claimant had not required psychiatric medications for more than twelve months due to her ability to self-regulate and manage difficult aspects of her psychiatric conditions through behavioral interventions such as meditation, social supports, exercise, instant calming techniques, writing, and teaching (AR 1512). According to Dr. Epson, if claimant were "placed into a competitive employment environment[,] she would

5

likely have difficulty with their [*sic*] interpersonal interactions due to the combination of paranoid ideations, episodes of inappropriate anger, and chronic tendencies to have the perceptions others are malicious or persecutory in their intent/behavior/interactions with her" (AR 1514–15). He suggested that a reasonable accommodation for the claimant's symptoms would be "to have her in a supervisory role or to be up to work independently with an alternative schedule/metrics for productivity/demands," consistent with noncompetitive work (AR 1514).

The ALJ, however, found this medical source statement was speculative and "inconsistent with the claimant's ability to work" (AR 19). What's more, according to the ALJ, is that claimant's ability to "self regulate or [*sic*] her own emotions without any medication suggests to [*sic*] her mental impairments are not as limiting as alleged" (AR 19–20). And, that "claimant could work in a supervisory role . . . suggests that the claimant may have greater abilities than stated in the rest of this assessment" and "that she is capable of a highly skilled position" (AR 20). With respect to the questionnaire portion of this medical source statement, the ALJ further explained that it was "inconsistent with the claimant's activities of daily living" and "Dr. Epson's finding that claimant could work in a supervisory role," and that claimant's ability to work as an in-home support services caretaker "suggests some mental functioning" (*ibid.*). Meanwhile, with respect to an attached letter from July 2020 written by Dr. Epson at claimant's request, the ALJ further explained that this list of symptoms was "inconsistent with the claimant's ability to ride a bike, attend tai chi and perform activities of daily living independently," and that a "physician might want to write a note simply to avoid unnecessary tension" (AR 19).

### B.    LESLIE FORELL, PSYD.[2]

Dr. Leslie Forell is a psychotherapist who co-facilitated an outpatient therapy group claimant attended from 2011 to 2013, provided supportive case management from 2011 to

---

[2] The parties and the ALJ spell Dr. Forell's name differently (*compare* AR 18 ("Forell"), *with* Claimant Br. 5, *and* Respondent Br. 6 ("Ferrell")). This order uses the spelling listed in her medical source statement (AR 1152, 1156).

2016, and was claimant's primary individual therapist from January to April 2017 (AR 1152). The ALJ did not mention Dr. Forell's treatment history and accorded her medical source statement "little weight" (AR 18). In that statement, dated September 2017, Dr. Forell diagnosed claimant with Major Depressive Disorder, Recurrent and Personality Disorder, Other Specified (AR 1152). She observed that claimant had moderate and marked functional limitations except for "ability to follow work rules and procedures" and "ability to maintain personal appearance and hygiene," which she found to have no limitation (AR 1153–55). Again, the ALJ explained that Dr. Forell's opined moderate and marked limitations were too restrictive in light of the treatment record and the claimant's daily activities (AR 18). She also asserted that Dr. Forell's statement that claimant had been fired from many jobs due to errors and failure to meet performance standards was not supported by the record (*ibid*.).[3]

### C.   BRENDAN YEE, D.O.

Dr. Brendan Yee is a practitioner who treated claimant for 1.5 years prior to writing his medial source statement, dated March 2021 (AR 1517–20). As respondent observes, Dr. Yee appears to have treated claimant's physical health concerns (Respondent Br. 7 (citing AR 1237, 1240, 1244, 1247, 1266)). The ALJ noted "[i]t is unclear what be [*sic*] treating relationship is with Dr. Yee and the claimant" and accorded the assessment "reduced weight" (AR 20). Dr. Yee observed that claimant would need unscheduled breaks, would need to work reduced hours of three to four hours per day, and would likely be absent from work four times per month (AR 1519). Once more, the ALJ explained that Dr. Yee's assessment was inconsistent with claimant's ability to work and her activities of daily living (AR 20).

### D.   APARNA DIXIT, PSYD.

Dr. Aparna Dixit is a consultative examiner who performed a psychological consultative examination of claimant in December 2020 (AR 1165–68). The ALJ accorded Dr. Dixit's

---

[3] According to the ALJ, Dr. Forell asserted that claimant would likely miss work on an unscheduled basis due to her impairments (AR 18). This order observes, however, that Dr. Forell appears to have crossed out her checkmark under "Yes" and replaced it with "Cannot Say" (AR 1156). This order further observes that Dr. Forell states that claimant's limitations would have started on November 14, 2016, after the alleged onset date (AR 1155). Upon remand, the ALJ may wish to consider these facts.

assessment "partial weight" (AR 17).  In her evaluation, Dr. Dixit diagnosed claimant with a Major Depressive Disorder, marked, recurrent, without psychosis, and ruled out Bipolar II Disorder and Borderline Personality Disorder (AR 1168).  Dr. Dixit opined, *inter alia*, that claimant could "understand, remember, and carry out simple instructions with no difficulty," but that claimant would have moderate to marked impairments in all other functional areas (AR 1168).  The ALJ noted that she was adopting limitations on interacting with the public given claimant's self-isolative behavior and history of conflicts, but that Dr. Dixit's finding that the claimant would have moderate and marked impairment in other areas was overly restrictive and inconsistent with claimant's ability to provide in-home support services, do tai chi, and perform calculations during her examination (AR 17).

### E. SANDRA DEVINE, LCSW.

Ms. Sandra Devine is a therapist who submitted a letter dated December 2018 (AR 1090).  The ALJ accorded Ms. Devine's statements "little weight" (AR 18).  In her letter, dated December 2018, Ms. Devine assessed the claimant with Borderline Personality Disorder and Depressive Disorder, unspecified (AR 1090).  Specifically, she opined that claimant "cannot stabilize her emotions and behaviors to work or attend treatment programs regularly" (*ibid*.).  The ALJ found Ms. Devine's opinion conclusory, "with no specific functional limitations" and "not long treatment history" (AR 18).  The ALJ emphasized that the opinion was primarily a report of the claimant's statements and that opinion on whether an individual is disabled goes to an issue reserved to the Commissioner (*ibid*.).

### F. STATE AGENCY.

In its initial and reconsideration assessments (AR 82–110), the state agency found claimant limited to simple one to two step tasks, with superficial coworker and incidental public contact (AR 91, 106).  The ALJ accorded these findings "partial weight," agreeing with restrictions to simple work and limited contact based on her anxiety, irritability, and agitation, but found additional restrictions warranted, restricting claimant to work that did not have regular interaction with the general public, consistent with her history of conflicts (AR 16).

### 3. OTHER EVIDENCE.

Dr. Kate Colwell is the niece of claimant's neighbor (the "best friend" in claimant's testimony) for whom claimant briefly provided in-home support services. Dr. Colwell expressly wrote her letter not as a physician but "as the Attorney in Fact (DPA) for [her] aunt" (AR 1162). Her third-party statement, dated April 2019, was given "little weight" (AR 18; *see* AR 1162–63). The ALJ observed that although Dr. Colwell is a medical professional, she never had a treating relationship with claimant, and her statements were based on casual encounters and secondhand statements from her 90-year old aunt who suffered from dementia, not clinical observations (AR 17–18).

Regina Carey submitted a third-party function report, dated May 2017 (AR 389–96). In that report, Ms. Carey observed that claimant could not handle stress and was easily frustrated (AR 389, 395). The ALJ assigned the assessment partial weight, recognizing it was "lay opinion based upon casual observation, rather than objective medical evidence," that it was "not fully completed," and that it "lack[ed] substantial support from objective findings in the record" (AR 20–21).

At the February 2022 hearing, vocational expert Macy-Powers responded to hypotheticals and testified to claimant's inability to perform past work and ability to perform the requirements of potential representative occupations (AR 66–80). The ALJ accepted and adopted Macy-Powers' testimony (AR 23–24).

## ANALYSIS

A decision denying disability benefits must be upheld if it is supported by substantial evidence and free of legal error. *See Stout v. Comm'r Soc. Sec.*, 454 F.3d 1050, 1052 (9th Cir. 2006). "'Substantial evidence' means more than a scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). The reviewing court must "consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Ibid.* (internal quotation marks and

1    citations omitted). "The ALJ is responsible for determining credibility, resolving conflicts in
2    medical testimony, and for resolving ambiguities," so when the evidence can reasonably
3    support either affirming or reversing a decision, a reviewing court will defer to the judgment of
4    the ALJ. *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews v. Shalala*,
5    53 F.3d 1035, 1039 (9th Cir. 1995)).

     Claimant asserts the ALJ erred by, *inter alia*, improperly weighing the medical evidence by discounting the opinions of practitioners who had direct contact with claimant. Respondent counters that the ALJ's evaluation of these opinions was wholly consistent with binding legal authority and was supported by substantial evidence, as required. For the reasons that follow, this order agrees with claimant.

   **1.   THE ALJ IMPROPERLY WEIGHED MEDICAL OPINION EVIDENCE.**

   "Under the pre-[March] 2017 regulations that apply to [this] claim, ALJs are required to give greater weight to certain medical opinions." *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Specifically, a reviewing court "distinguish[es] among the opinions provided by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

   "While the opinion of a treating physician is [] entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Ibid*. "An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she or he provides specific and legitimate reasons supported by substantial evidence in the record." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (internal quotations and citation omitted).

   The record indicates that Dr. Epson, Dr. Ferrell, and Dr. Yee were treating physicians, Dr. Dixit was an examining physician, and the agency doctors at the initial and reconsideration stages were nonexamining physicians. The ALJ assigned the opinions of all of the treating

physicians little or reduced weight and the opinions of the examining and nonexamining physicians partial weight.[4] Note the ALJ rejected the opinions of all treating physicians because she found that they were (1) inconsistent with the treatment record, (2) inconsistent with claimant's ability to perform activities of daily living, and/or (3) inconsistent with evidence showing claimant's ability to maintain employment. Although these reasons can constitute an adequate reason to discredit opinions, they are not sufficient reasons here.

First, with respect to inconsistency with the treatment record, the Ninth Circuit has explained:

> A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider. But such observations must be read in context of the overall diagnostic picture the provider draws. The fact that a person suffering from depression makes some improvement does not mean that the person's impairment no longer seriously affects her ability to function in a workplace.

*Ghanim v. Colvin*, 763 F.3d 1154, 1161–62 (9th Cir. 2014) (internal quotations, citations, and alterations omitted); *see also Lester*, 81 F.3d 821, 833 (9th Cir. 1995) (noting "[o]ccasional symptom-free periods . . . are not inconsistent with disability"). Here, like in *Ghanim*, substantial evidence does not support the ALJ's conclusion that the opinions of Dr. Epson, Dr. Forell, and Dr. Yee were inconsistent with the treatment notes. After all, "[t]he treatment notes consistently reflect that [claimant] continued to experience severe symptoms, including ongoing depression[.]" *Id*. at 1161.

True, the notes occasionally reflect improved mood and energy level,

> But such observations must be "read in context of the overall diagnostic picture" the provider draws. *Holohan*, 246 F.3d at 1205; *cf. Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods . . . are not inconsistent with disability."). The fact that a person suffering from depression makes some improvement "does not mean that the person's

---

[4] As noted above, Dr. Colwell's letter was written in her capacity as "Attorney in Fact" for her aunt, not in her capacity as a doctor, and as such, it is lay opinion. Ms. Devine was not an "[a]cceptable medical source" and was not entitled to the same deference. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). This order does not reach whether the ALJ properly discounted her testimony for germane reasons specific to Ms. Devine.

11

> impairment [ ] no longer seriously affect[s] [her] ability to function in a workplace." *Holohan*, 246 F.3d at 1205[.]

*Ghanim*, 763 F.3d at 1162.

The same principle applies to claimant's ability to perform activities of daily living, which the ALJ heavily relied on to discount the opinions of both the treating physicians and the examining physician. The ALJ cites the same activities, namely claimant's ability to "attend tai chi and writing classes, go shopping, have a birthday," as inconsistent with the assessments of all treating and examining physicians (AR 17–19, 21). The ALJ's analysis therefore appears to presuppose an inability to enjoy those activities for anyone fitting the descriptions provided by all four treating and examining physicians. But just like in *Ghanim*, the opinions of Dr. Epson, Dr. Ferrell, Dr. Dixit, and Dr. Yee of moderate and marked impairments do not *necessarily* conflict with her claimed ability to perform activities of daily living. Indeed, Dr. Epson *expressly discusses* her tai chi, writing, and poetry in his medical source statement that provides for impairments, writing that despite those abilities, there remain "discrete episodes of notable impairment" and that "[i]t is the timeline of these escalations and eventual settling of emotional states that would likely impair" claimant (AR 1513–14). "A claimant need not be completely incapacitated to receive benefits," so claimant's "limited daily activities are not in tension with the opinions of his treating providers." *Ghanim*, 763 F.3d at 1162 (citing *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996)). Rather than certain activities such as tai chi being automatically disqualifying, "a holistic review of the record does not reveal an inconsistency between the treating providers' opinions and [claimant's] daily activities." *Ibid.*[5] Here, a holistic analysis warrants squaring claimant's alleged abilities with her assessed impairments, as opposed to presupposing that abilities and impairments are mutually exclusive.

Of particular concern is that the ALJ essentially rejected the opinions of claimant's treating physicians. All of these doctors opined that claimant had a greater degree of mental

---

[5] This order notes that Dr. Yee's assessment is less relevant than the other two treating physicians because he treated claimant for physical conditions, while the ALJ correctly observed that the relevant issues here regard claimant's mental conditions. But that does not affect outcome or analysis here.

12

impairment than the degree of impairment found by the ALJ, with Dr. Epson explicitly considering the daily activities the ALJ found inconsistent with his assessment. The ALJ did credit the opinions of examining physician Dr. Dixit with partial weight, but apparently solely for the proposition that "the claimant would have difficulty dealing with the public." The ALJ nevertheless broadly disregarded Dr. Dixit's opinions that "claimant would have moderate and marked impairment in other areas" as "overly restrictive," again citing tai chi as well as claimant's intermittent work history (AR 17). The ALJ also credited the state agency's opinions of "restrictions to simple work and limited contact" with partial weight, but found that the additional restriction of limited public interaction was warranted (AR 16).

    The ALJ thus appears to have drawn her own conclusions of claimant's abilities from claimant's daily activities, and discounted the medical opinions divergent from those conclusions. In other words, the ALJ substituted her own lay interpretation of the medical evidence contained in treatment records without deference to that of the treating and examining physicians. True, there "is a presumption that ALJs are, at some level, capable of independently reviewing and forming conclusions about medical evidence to discharge their statutory duty to determine whether a claimant is disabled and cannot work" which is why an ALJ "may reject the opinion of a *non-examining* physician by reference to specific evidence in the medical record." *Farlow*, 53 F.4th at 488 (emphasis added) (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998)). But "[t]o reject the uncontested opinion of an examining or treating doctor, an ALJ must provide 'clear and convincing' reasons supported by substantial evidence." *Ibid.* (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). "[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). As explained in the foregoing, the lack of a more holistic analysis is insufficient to meet that standard.

    Apart from claimant's daily activities, the ALJ also pointed to the fact that claimant was employed at some point to support her determinations. However, the ALJ did not explain why

13

the treating and examining physicians' assessments of moderate and marked impairments conflict with claimant's sparse employment history. The record shows that claimant worked part time as an IHHS caretaker and was unable to meet her employer's requirement that she become a full-time employee. Dr. Colwell's lay observations of claimant's performance as a part-time IHSS worker for her aunt — afforded little weight by the ALJ — describes claimant as "completely unable to do the job of caring for her aunt on a regular basis" (AR 17–18). While anecdotal, it remains the only evidence in the record of claimant's recent employment behavior. Dr. Forrell similarly opined that claimant "would likely miss work on an unscheduled basis due to her impairments" and claimant had been "fired from many jobs due to errors and failure to meet performance standards," but the ALJ also afforded that opinion little weight because "[t]he record fails to support the reporting that the claimant had been fired from many jobs" (AR 18). However, even discounting the foregoing evidence, there remains no demonstrated employment capacity that would contradict the findings of moderate and marked impairments. Rather, the ALJ simply relied on the fact that claimant was once employed part-time to make her own assessment that claimant *can* work at a certain capacity (and not that she has done so), which was used to discount medical opinions concluding the contrary. The ALJ states that Dr. Epson's assessments of claimant's work capacity are "overly speculative," but the ALJ's analysis is likewise speculative given the dearth of evidence regarding employment let alone performance during employment. Furthermore, the ALJ also discounts Dr. Epson's July 2020 letter because "[a] physician might want to write a note simply to avoid unnecessary tension," which is itself speculation and does not account for his various other assessments at different times. It would not be speculation however if there are inconsistencies in the record that create doubt, or if the ALJ could otherwise support any credibility concerns. In its current state however, the ALJ's analysis does not demonstrate the requisite deference to treating physicians and is not supported by substantial evidence.

    At bottom, it is not for the ALJ or this district court to say the fact that claimant could do tai chi and was once employed means she could now work a 40-hour work week, contrary to the opinions of treating and examining physicians. If the ALJ believed the evidence was

14

ambiguous or inadequate, she could have requested that the treating sources provide further clarification of their opinions. Indeed, the Appeals Council expressly suggested that the ALJ "request the treating and nontreating sources provide additional evidence and/or further clarification of the opinions" as appropriate (AR 114–15). Alas, the ALJ did not do so. The ALJ did consider the opinion of a doctor from a consultative examination, as the Appeals Counsel had also suggested (*ibid.*). But the ALJ proceeded to largely reject the opinion of that examining doctor (Dr. Dixit), as explained above. On remand, the ALJ shall properly address the medical opinions in the record on claimant's mental limitations, seeking information as needed to attempt to reconcile her specific daily activities with her assessed impairments and work capacity. This may yet reveal that claimant's daily activities are in fact irreconcilable with certain medical opinions. There may be conflicts in medical testimony, specific ambiguities, or credibility issues to point to that would more clearly justify the ALJ's determination. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). After all, "[a]n ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *Osenbrock v. Apfel*, 240 F.3d 1157, 1164–65 (9th Cir. 2001). But without a more robust inquiry, the ALJ has not provided sufficient reasoning for discounting multiple medical opinions that warrant deferential weight.

Because this order finds remand necessary seeing that the ALJ committed reversible error by rejecting medical opinions regarding claimant's mental condition, it does not reach claimant's additional contentions except insofar as to determine that a reversal and remand for immediate payment of benefits would not be appropriate on such grounds. *See Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2016). Upon remand, the ALJ may wish to consider claimant's other contentions.

2.  **REMAND IS APPROPRIATE.**

A district court may either remand for further proceedings or credit as true testimony the ALJ failed to adequately justify rejecting and order an immediate award of benefits. Generally, when an order reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Ibid*.

15

Indeed, it is the claimant who has the burden of proving disability. *Andrews*, 53 F.3d at 1040. Where "there are outstanding issues that must be resolved before a determination can be made, or if further administrative proceedings would be useful, a remand [for further proceedings] is necessary." *Leon v. Berryhill*, 880 F.3d 1041, 1047 (9th Cir. 2017).

Given the foregoing discussion, this order finds that further administrative proceedings would be useful.

## CONCLUSION

To the foregoing extent, claimant's motion for summary judgment is **GRANTED**. Claimant's request for an immediate determination of benefits is **DENIED**, and this matter is **REMANDED** for further administrative proceedings consistent with this order. The Acting Commissioner's cross-motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 23, 2023.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE